# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PACIFIC GAS AND ELECTRIC
COMPANY,
                    *Petitioner,*

NORTHERN CALIFORNIA POWER
AGENCY; WILLIAMS POWER
COMPANY INC.; POWEREX
CORPORATION; RELIANT ENERGY
POWER GENERATION, INC.; DUKE
ENERGY NORTH AMERICA, LLC,
DUKE ENERGY TRADING AND
MARKETING, LLC, (COLLECTIVELY,
"DUKE ENERGY"); CALIFORNIA
ELECTRICTY OVERSIGHT BOARD;
DYNEGY POWER MARKETING, INC.,
EL SEGUNDO POWER LLC, LONG
BEACH GENERATION LLC, CABRILLO
POWER I LLC, AND CABRILLO
POWER II LLC (COLLECTIVELY,
"DYNEGY"); M-S-R PUBLIC POWER
AGENCY; THE MODESTO IRRIGATION
DISTRICT; CITY OF SANTA CLARA,
CALIFORNIA; THE MODESTO
IRRIGATION DISTRICT; CITY OF
REDDING, CALIFORNIA; AVISTA
ENERGY INC.; PUGET SOUND
ENERGY, INC.,
                    *Intervenors,*

No. 04-70635

FERC No.
EL00-746-000
through -003

OPINION

v.

Federal Energy Regulatory
Commission,

*Respondent,*

California Independent System
Operator Corporation,

*Intervenor.*

California Independent System
Operator Corporation,

*Petitioner,*

Duke Energy North America,
LLC, Duke Energy Trading and
Marketing, LLC, (Collectively,
"Duke Energy"),

*Intervenor,*

v.

Federal Energy Regulatory
Commission,

*Respondent-Appellee.*

No. 04-71613

FERC No.
ER03-746-001 and
ER03-746-002

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

Argued November 14, 2005
Submission Deferred November 16, 2005
Resubmitted for Decision September 18, 2006
San Francisco, California

Filed September 18, 2006

Before: A. Wallace Tashima, Sidney R. Thomas, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Thomas

**COUNSEL**

Paul B. Mohler, Heller Ehrman White & McAuliffe, Washington, D.C.; Stan Berman, Heller Ehrman White &

McAuliffe, Seattle, Washington; Joshua Bar-Lev, Mark D. Patrizio, Kermit R. Kubitz, San Francisco, California, for petitioner PG&E.

Charles F. Robinson, Anthony J. Ivancovich, Gene L. Waas, Folsom, California; Michael E. Ward, J. Phillip Jordan, Bradley R. Miliauskas, Swidler Berlin Shereff Friedman, Washington, D.C.; Erik N. Saltmarsh, Victoria S. Kolakoski, California Electricity Oversight Board, Sacramento, California, for petitioner-intervenor Cal-ISO and intervenor California Electricity Oversight Board.

Cynthia A. Marlette, Dennis Lane, Beth G. Pacella, Washington, D.C., for respondent FERC.

## OPINION

THOMAS, Circuit Judge:

In this case, we consider another piece of the California energy crisis puzzle.[1] Before us are petitions for review from the California Independent System Operator ("Cal-ISO") and Pacific Gas and Electric Company ("PG&E"), alleging that the Federal Energy Regulatory Commission ("FERC") committed various errors in permitting Cal-ISO to re-run certain Settlement Statements. We dismiss the petitions for lack of subject matter jurisdiction. We conclude that we lack subject matter jurisdiction to consider Cal-ISO's petition for review because it implicates FERC's prosecutorial discretion. We conclude that we lack subject matter jurisdiction to entertain

---

[1]We deferred submission of this case pending resolution of *Public Utilities Comm'n v. FERC*, 456 F.3d 1025 (9th Cir. Aug. 2, 2006) ("*PUC-FERC*"). This case was resubmitted for decision following the filing of the *PUC-FERC* opinion.

PG&E's petition for review because it is an impermissible collateral attack on a prior FERC order.[2]

## I

These are two more cases in a series of cases concerning California's energy crisis, which occurred from 1998-2002. We have provided a history of the crisis in other opinions, *see e.g., PUC-FERC*, 2006 WL 2147552 at *2-*12, so it is unnecessary for us to detail it here except as necessary to explain our reasoning. *See also Cal. ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1008-11 (9th Cir. 2004) (summarizing the history of the California energy crisis and FERC's response).

In brief, with the goal of converting California's investor-owned, regulated utilities to a deregulated, competitive market, the California legislature enacted Assembly Bill 1890 ("AB 1890"). Act of September 23, 1996, 1996 Cal. Legis. Serv. 854 (codified at Cal. Pub. Util. Code §§ 330-398.5). Under AB 1890, the major investor-owned, vertically integrated utilities were required to divest a substantial portion of their power generation plants to unregulated, non-utility producers. After divesting the generation assets, the investor-owned utilities were required to sell all of their remaining output to the California Power Exchange ("CalPX"), a nonprofit wholesale clearinghouse created by AB 1890. CalPX, which was deemed a public utility pursuant to the Federal Power Act, *see* 16 U.S.C. § 824(e), and thus subject to regulation by FERC, *see* 16 U.S.C. § 824(b), (d), was to provide a centralized auction market for trading electricity.

AB 1890 created another nonprofit entity, the California

---

[2]Because we dismiss both petitions for lack of jurisdiction and do not reach the merits of either petition, the motions of (1) M-S-R Power Agency, *et al.* and (2) Puget Sound Energy, Inc., for leave to intervene are DENIED. Similarly, PowerEx Corp.'s motion for reconsideration of our prior order denying it leave to intervene is DENIED.

Independent System Operator ("Cal-ISO"), also subject to FERC jurisdiction, which was to be responsible for managing California's electricity transmission grid and balancing electrical supply and demand. Although the investor-owned utilities continued to own the transmission facilities, Cal-ISO exercised operational control over the grid.

To maintain the necessary balance, Cal-ISO was authorized, and, during the California energy crisis, often required, to purchase energy. It purchased two types of energy: (1) "uninstructed imbalance energy," which it used to balance the electrical grid, and (2) "operating reserves," or "ancillary services capacity," which a seller agreed to hold in abeyance in case of a shortage or other emergency. When it purchased operating reserves, Cal-ISO paid the seller full fare, even if it did not ultimately need the reserved energy.

Cal-ISO's energy purchases led to two distinct problems. First, after a thirty-month investigation, Cal-ISO discovered that fourteen entities may have been selling single units of energy as both uninstructed imbalance energy and operating reserves from April 1, 1998, to September 9, 2000. If true, those entities "doubled billed" Cal-ISO because they received two payments for a single unit of energy: one payment for uninstructed imbalance energy, and another for operating reserves, even though no energy was actually reserved.

Second, Cal-ISO made some of its energy purchases in the form of energy exchange transactions, in which Cal-ISO paid for the energy needed to balance the electricity grid in kind, rather than in cash. In a typical transaction, a seller would supply Cal-ISO with energy to balance the grid, and Cal-ISO would repay the seller — usually the next day — with two units of energy for every one unit provided. The energy exchange transactions proved difficult for Cal-ISO because it was required, as a non profit corporation, to keep a neutral cash balance, and the energy exchange transactions led to accounting imbalances. When Cal-ISO received energy as

part of an exchange transaction, it showed a positive balance. When, however, Cal-ISO paid for the energy, it showed a negative balance. To remedy these imbalances, Cal-ISO implemented a "Neutrality Adjustment Charge," which spread the costs incurred in balancing the electricity grid among all market participants, even if individual entities bore no responsibility for those grid imbalances.

Following deregulation and the creation of CalPX and Cal-ISO, certain energy providers were alleged to have manipulated the California energy market through a variety of means, resulting in artificially inflated energy prices. In August 2000, San Diego Gas and Electric Company ("SDG&E") filed a complaint under § 206 of the Federal Power Act, 16 U.S.C. § 824e(a), against sellers of energy and ancillary services in the CalPX and Cal-ISO markets. SDG&E requested that FERC impose a price cap on sales into those markets. Other parties, including PG&E and the State of California, joined the complaint.

On August 23, 2000, FERC issued an order denying the relief requested by SDG&E, but determining that it was appropriate to investigate the justness and reasonableness of the rates for all sales in the CalPX and Cal-ISO markets. *San Diego Gas & Elec. Co., et. al.*, 92 F.E.R.C. ¶ 61,172 (2000) ("August 23, 2000 Order"). Therefore, it established its own investigatory proceeding in FERC Docket Nos. EL-00-95 and EL00-98 ("the Remedy Proceeding"). FERC also initiated a show-cause hearing regarding energy prices in California. *See , e.g.*, *Am. Elec. Power Serv. Corp.*, 103 F.E.R.C. ¶ 61,345 (2003).

As part of the Refund Proceeding, FERC established a mitigated market clearing price ("MMCP"), which estimated what the market price for energy would have been in a competitive market. *See San Diego Gas & Elec. Co.*, 102 F.E.R.C. ¶ 61,317 at 62,062 (2003). FERC then ordered Cal-ISO to re-run past Settlement Statements, which are Cal-ISO's invoices,

to reflect what they would have been had consumers been charged the MMCP, enabling FERC to calculate the refunds owed to California consumers. *See id.* at 62,063.

Before conducting the re-run that FERC ordered in the Refund Proceeding, Cal-ISO sought to perform a preliminary re-run to eliminate the effects of "double selling," the "Neutrality Adjustment Charge," and other errors in its settlement procedure. The preliminary re-run would have given Cal-ISO the "appropriate baseline" against which to complete the FERC-ordered re-run.

Cal-ISO proposed Cal-ISO Tariff Amendment Number 51 ("Amendment 51") to remove any obstacles to its completing the preliminary re-run. FERC conditionally accepted Amendment 51, subject to Cal-ISO's submitting a compliance filing that provided further detail about the scope and effects of the proposed Tariff amendments. *Cal. Indep. Sys. Operator Corp.*, 103 F.E.R.C. ¶ 61,331 (2003). Cal-ISO provided more detail about Amendment 51, and FERC approved the majority of Cal-ISO's proposed amendments on November 14, 2003. *Cal. Ind. Sys. Operating Corp.*, 105 F.E.R.C. ¶ 61,203 (2003) ("November 14 Order"). These petitions for review stem from the portions of Amendment 51 that address the "double selling" and "Neutrality Adjustment Charge" problems.

To address the "double selling" problem, Cal-ISO proposed to amend its operating Tariff to permit recision of double payments made between April 1, 1998 and September 9, 2000. FERC rejected the proposal, noting that "this proposed adjustment concerns the 'double selling' issue set for hearing in the Enron strategy show cause proceedings." November 14 Order, 105 F.E.R.C. ¶ 61,203 at 62,061. FERC refused Cal-ISO's request for rehearing, noting that the proposed changes to the Tariff would have "address[ed] more transactions, more parties, and a longer time period than specified in the Commission's Show Cause Proceedings." *Cal. Ind. Sys. Operating Corp.*, 106 F.E.R.C. ¶ 61,099 at 61,350 (2004) ("February 3

Order"). More specifically, FERC rejected Cal-ISO's proposed Tariff amendment because it

> proposes to address the time period of April 1, 1998 to September 9, 2000 and encompass ten other entities that were not covered in the Show Cause Proceeding. In the Show Cause Proceedings the Commission determined that the relevant time period was January 1, 2000 to June 20, 2001 to explore certain gaming issues, including double selling. Also, in the Show Cause Proceedings the Commission investigated and determined there was only enough evidence to proceed with four parties on the double selling issue. We reject the [Cal-ISO's] attempt to use the re-run adjustment in this docket to expand the transactions covered under the Show Cause Proceedings. We find that the Show Cause Proceedings are the proper forum to resolve disputed legal and factual issues related to alleged double selling. Therefore, we will reject the [Cal-ISO's] adjustment to rescind payments for ancillary services and we will deny the [Cal-ISO's] request for rehearing on this issue.

*Id.* at ¶ 61,351. Cal-ISO petitioned for review in this court.

To address the fact that the "Neutrality Adjustment Charge" accounting method unfairly charged all market participants — even those who had no hand in the energy imbalances — for the deficits shown on Cal-ISO's books, Cal-ISO sought to re-run Settlement Statements using the "Total Negative Uninstructed Imbalance Energy" accounting method. Under that method, only those parties who caused the energy imbalances would bear the expense of balancing the grid. FERC approved of Cal-ISO's proposal on November 14, 2003, despite the fact that the amendment would have shifted between one and two hundred million dollars in settled charges, November 14 Order, 105 F.E.R.C. ¶ 61,203, and

refused to reconsider its decision, February 3, 2004 Order, 106 F.E.R.C. ¶ 61,099. PG&E petitioned this court for review.[3]

## II

The threshold question is whether we have jurisdiction to entertain the petitions for review. FERC argues that we lack jurisdiction over the Cal-ISO petition under *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). It contends that we lack jurisdiction over the PG&E petition as an impermissible collateral attack on a final FERC order. We are required to establish our jurisdiction before reaching the merits of the petitions. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).

## A

**[1]** Under the Administrative Procedure Act, we may review agency actions "except to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). We are thus presumptively prohibited from reviewing "an agency's decision not to prosecute or enforce, whether through civil or criminal process" because such decisions are "generally committed to an agency's absolute discretion." *Heckler*, 470 U.S. at 831-32. The *Heckler* jurisdictional bar "is applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Id.* at 830.

**[2]** While the presumption against judicial review "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers," *id.* at 833, the relevant provisions of the FPA "reveal[ ] no such establishment of priorities or meaningful guidelines,"

---

[3]To the extent that PG&E's petition requires us to consider documents not part of the record in this case, PG&E's unopposed motion for judicial notice is GRANTED.

*Friends of the Cowlitz v. FERC*, 253 F.3d 1161, 1171 (9th Cir. 2001), *amended by* 282 F.3d 609 (2002). On the contrary, the FPA gives FERC "wide latitude in its enforcement decisions." *Id.*[4]

**[3]** Cal-ISO seeks review of an order in which FERC declined to amend Cal-ISO's Tariff so that Cal-ISO could re-run certain Settlement Statements to correct alleged instances of "double selling." FERC denied Cal-ISO's proposed amendment because FERC had already investigated "double selling" in the California energy market, and had determined that the recisions would apply to a narrower time period and fewer parties than Cal-ISO requested in Amendment 51. March 3 Order, 106 F.E.R.C. ¶ 61,099 at 61,350-351. Cal-ISO's petition for review effectively complains that FERC acted arbitrarily and capriciously in limiting *its prosecution* of "double selling" in the California energy market. Because FERC retains almost unfettered discretion to initiate investigations and prosecute violations of the FPA, we lack jurisdiction to review FERC's order under *Heckler*, and dismiss Cal-ISO's petition for review.

Cal-ISO argues that *Heckler* does not apply to this case because the underlying principle in *Heckler* is that courts should not second-guess agency decisions.

> An agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the

---

[4]Of course, our lack of jurisdiction over FERC's purely discretionary prosecutorial decisions does not relieve FERC of its duty to adjudicate. *PUC-FERC*, 2006 WL 2147552 at *17-*18.

agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all. An agency generally cannot act against each technical violation of the statute it is charged with enforcing. The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.

470 U.S. at 831-32. Here, however, Cal-ISO argues that Cal-ISO was not asking FERC to use *FERC's* enforcement power. Rather, Cal-ISO "was seeking to act *pursuant to its tariff.*" Cal-ISO's argument is unconvincing for two reasons.

**[4]** First, Cal-ISO's argument stems from a faulty premise. Cal-ISO assumes that it had the authority, pursuant to its Tariff, to re-run Settlement Statements to correct instances of illegal "double selling." It is well-settled that "the Federal Power Act . . . grants FERC 'exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce.' " *Public Util. Dist. No. 1 v. IDACORP Inc.*, 379 F.3d 641 (9th Cir. 2004) (quoting *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 928 (9th Cir. 2002)). *See also Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 852 (9th Cir. 2004) ("Remedies for breach and non-performance of [FERC]-approved operating agreements in the interstate wholesale electricity market fall within the exclusive domain of FERC." (submission deferred pending bankruptcy)). Given that FERC has exclusive jurisdiction to regulate electricity markets, Cal-ISO simply lacks the power to conduct a re-run without FERC's approval to correct "double selling" violations of the FPA. FERC, therefore, was correct when it noted that Cal-ISO's "compliance filing improperly attempts to rescind ancillary services capacity payments related to alleged 'Double Selling' and the proper forum for this issue is one of the Show Cause proceedings." November 13 Order, 105 F.E.R.C. ¶ 61,203 at ¶ 16.

**[5]** Moreover, even assuming, without deciding, that FERC could have legally delegated its enforcement authority to Cal-

ISO, we do not believe that FERC intended any such delegation here. Cal-ISO's Tariff admittedly permitted it "to perform Settlement Statement re-runs" after the Cal-ISO Governing Board has "determine[d] in its reasonable discretion, whether there is good cause to justify the performance of a Settlement Statement re-run." While Cal-ISO clearly has some authority to conduct re-runs — perhaps in the event of a clerical error — we do not read the generic and broad-reaching language in the Tariff as a delegation of FERC's otherwise exclusive enforcement authority under the FPA.

**[6]** Second, FERC, in its February 3 Order, clearly characterizes its November 13 Order as a denial of Cal-ISO's request "to expand the transactions covered under the Show Cause Proceedings." February 3 Order, 106 F.E.R.C. ¶ 61,099 at 61,350-351. In stating that it refused Cal-ISO's request to expand the scope of the re-run it had ordered as part of its enforcement proceedings, FERC necessarily declined to exercise *its* enforcement authority under the FPA. The record simply does not support Cal-ISO's argument that FERC was attempting "through *ex post facto* decree to transmute its rejection of [Cal-ISO's] proposed rerun into a refusal to exercise enforcement authority." Moreover, "it is well established that an agency's interpretation of the intended effect of its own orders is controlling unless clearly erroneous." *Sw. Gas Corp. v. FERC*, 145 F.3d 365, 370 (D.C. Cir. 1998). Because FERC's February 3 interpretation of its November 13 Order is not clearly erroneous, we must accept it as controlling. Thus, we dismiss Cal-ISO's petition for review for lack of jurisdiction under *Heckler*.

### B

**[7]** Under the FPA, we have jurisdiction to hear petitions for review from any party aggrieved by a FERC order. 16 U.S.C. § 825*l*(b). Our jurisdiction, however, is limited to review of new orders. We may not entertain a petition for review that collaterally attacks a prior FERC order. *IDA-*

*CORP Inc.*, 379 F.3d at 652 n.12 ("Under the FPA, a party aggrieved by a FERC order must obtain review of that order by petitioning the court of appeals; that party cannot attack the order by way of a new lawsuit in federal court."). To determine whether a petition for review is barred as a collateral attack on a prior order, we must determine whether the order upon which the petition is based "was merely a 'clarification'" of a prior order, or whether it "was a 'modification'" of a prior order. *Dominion Res., Inc. v. FERC*, 286 F.3d 586, 589 (D.C. Cir. 2002). The latter is reviewable on appeal, while review of the former is barred as an impermissible collateral attack. To differentiate between a clarification and a modification, we ask "whether a reasonable [party] in [the petitioner's] position would have perceived a very substantial risk that [the original order] meant what the Commission now says it meant." *Id.* at 589-90 (quotations omitted).

The order in question is FERC's approval in the Refund Proceeding of Cal-ISO's proposal to apply the "Total Negative Uninstructed Imbalance Energy" accounting method to energy exchange transactions during the re-run. *See San Diego Gas & Elec. Co.*, 102 F.E.R.C. ¶ 61,317 at ¶ 14 (2003) (summarily adopting the administrative law judge's finding with respect to Cal-ISO's "proposed methodology for accounting for Energy Exchange Transactions").**⁵** FERC explicitly adopted the findings of the administrative law judge ("ALJ"), who stated in his *Certification of Proposed Findings on California Refund Liability*,

> On balance, I find and conclude that it is appropriate to account for energy exchange transactions under

---

**⁵**Cal-ISO's proposed accounting method derived from an agreement it entered into with the Bonneville Power Administration ("BPA") on August 23, 2001, in which Cal-ISO and BPA agreed to establish an energy exchange program using the "Total Negative Uninstructed Imbalance Energy" accounting method. FERC approved the agreement on October 17, 2001.

[Cal-ISO's] methodology as set forth in its energy exchange agreement with BPA. . . . This methodology allows these transactions to be identically treated in both [Cal-ISO's] production system and refund calculations and, thus, ensures symmetrical treatment in a just and reasonable manner.

*San Diego Gas & Elec. Co.*, 101 F.E.R.C. ¶ 63,026 at ¶536 (2002) ("ALJ Proposed Findings").

**[8]** When FERC approved provisions in Amendment 51 that permitted Cal-ISO to apply the "Total Negative Uninstructed Imbalance Energy" accounting method to its preliminary re-run of the energy exchange transactions, FERC simply clarified and implemented its previous order in the Refund Proceeding. It did not substantively alter the meaning or scope of its order in the Refund Proceeding. From FERC's explicit adoption of the ALJ's findings, a reasonable party in PG&E's position should have known that the "Total Negative Uninstructed Imbalance Energy" accounting method set forth in the BPA agreement was to apply to the re-run. Thus, to challenge FERC's approval of the "Total Negative Uninstructed Imbalance Energy" accounting method, PG&E's only option was to petition for review of the order entered in the Refund Proceeding. PG&E cannot obtain two bites of the proverbial apple by petitioning for review here as well. We, therefore, dismiss PG&E's petition for review for lack of jurisdiction.

PG&E makes three arguments in favor of our retaining jurisdiction, none of which we find persuasive. First, PG&E argues, citing *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1121-22 (9th Cir. 1997), that its petition for review is not an impermissible collateral attack on the Refund Proceeding order because that order is currently on appeal in this court. PG&E's argument is unpersuasive because at this time, we have rendered our decision in that appeal. *See PUC-FERC.*

Second, PG&E argues that the order in this case modified — not clarified — the order in the Refund Proceeding because the order in this case "involved an actual reallocation of costs" and the prior order had not given "the parties . . . a concrete proposal for how the proposed reallocation might impact the market or the parties." This argument is unconvincing because as explained above, PG&E should "have perceived a very substantial risk," *Dominion*, 286 F.3d at 589-90, from FERC's order in the Refund Proceeding that Cal-ISO would conduct its re-run using the "Total Negative Unstructured Imbalance Energy" accounting method, despite a potential shift of costs between market participants. The fact that the November 13 and February 4 orders may be more detailed than the order in the Refund Proceeding does change the fact that they clarified — not modified — the Refund Proceeding order and PG&E's expectations. In fact, as the ALJ summarized, PG&E's own expert testified that Cal-ISO

> was in the process of retroactively changing its accounting and settlements process for energy exchange transactions *that would substantially shift costs between market participants*. [The expert] advocated that [Cal-ISO] allocate these costs using the standard settlement accounting method in both the original and rerun settlements rather than developing new accounting methods not provided for in the [Cal-ISO] Tariff and that are outside the scope of this proceeding. She did not think [Cal-ISO's] reliance on its energy exchange agreement with BPA . . . was appropriate. It was inappropriate because [Cal-ISO] did not seek FERC approval for any special account treatment for exchanges that conflicted with the provisions of its tariff. [Cal-ISO] also did not have authority to retroactively change its accounting for energy exchange transactions.

ALJ Proposed Findings, 101 F.E.R.C. ¶ 63,026 at ¶ 533 (emphasis added). From the ALJ's summary of testimony

from PG&E's expert, it is clear that PG&E was very well aware that Cal-ISO's proposal to use "Total Negative Uninstructed Imbalance Energy" accounting method would result in an actual, and potentially significant, reallocation of costs between participants in the California electricity market. It is equally clear that PG&E raised the *same concerns* in the Refund Proceeding that it raises in the petition for review before us. We decline to readdress those concerns in this proceeding.

Finally, PG&E argues that its petition for review is not a collateral attack on the Refund Proceeding order because this order concerns a rate change, and therefore presents legal issues that were not present in the Refund Proceedings. *See* 16 U.S.C. § 824d(a) (requiring that FERC decide whether a public utility's rates are "just and reasonable"). This argument, too, is unpersuasive. PG&E does not request that we simply determine whether FERC erred in finding that an alleged rate increase was "just and reasonable." Rather, PG&E requests that we hold, in the first instance, that there was a change in rates, and that the change violated the prohibition of retroactive rate-making. *See generally Montana-Dakota Util. Co. v. N.W. Pub. Serv. Co.*, 341 U.S. 246 (1951). This question clearly arose — and PG&E argued it — in the Refund Proceeding. We decline to revisit it here.

**[9]** Because we hold that we lack jurisdiction to consider PG&E's petition for review as a collateral attack on the Refund Proceedings, we decline to consider whether PG&E's motion constitutes a collateral attack of either the agreement between Cal-ISO and the BPA, or Tariff Amendments 23 and 33. We also decline to reach Cal-ISO's substantive arguments regarding whether the "Total Negative Uninstructed Imbalance Energy" accounting method constituted impermissible retroactive ratemaking.

For these reasons, we dismiss Cal-ISO's and PG&E's petitions for review.

**DISMISSED.**