DOMINION RESOURCES, INC., Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

Rochester Gas and Electric Corporation, et al., Intervenors.

Nos. 01–1031 and 01–1169.

United States Court of Appeals, District of Columbia Circuit.

Argued March 5, 2002.

Decided April 19, 2002.

Catherine E. Stetson argued the cause for petitioners. With her on the briefs were Kevin J. Lipson, J. Patrick Nevins and Anne E. Bomar.

Robert H. Solomon, Associate Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Cynthia A. Marlette, General Counsel, and Dennis Lane, Solicitor.

Before: EDWARDS and RANDOLPH, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Senior Circuit Judge:

Petitioner Dominion Resources, Inc. is the surviving parent corporation in a merger of two already quite diverse companies, one ("Dominion") primarily an electric power company, the other (Consolidated Natural Gas Company ("CNG")) a natural gas pipeline with upstream and downstream affiliates. The parties refer to this type of merger as a "convergence merger." Dominion here challenges the Federal Energy Regulatory Commission's May 2000 Compliance Order requiring the pipeline subsidiary to observe FERC's Standards of Conduct, 18 C.F.R. §§ 161.3, 250.16, in dealing with all of its energy affiliates in the post-merger entity. See *Dominion Resources, Inc. & Consolidated Natural Gas Co.,* 91 FERC ¶ 61,140, 2000 WL 640577 (2000) ("Compliance Order"). Dominion contends that the Compliance Order was far broader than the order on which it purportedly rested, see *Dominion Resources, Inc. & Consolidated Natural Gas Co.,* 89 FERC ¶ 61,162, 1999 WL 1025495 (1999) ("Merger Order"), destroyed integrations that existed before the merger, and was thus arbitrary and capricious. We agree with Dominion and therefore vacate and remand.

\* \* \*

In June 1999 Dominion and CNG sought Commission authorization for their merger. See 16 U.S.C. § 824b. Dominion was a holding company with predominantly electric utility interests, specifically:

- Virginia Electric and Power Company, an electric transmission and distribution subsidiary; and
- Dominion Energy, a multifaceted firm active in
  - power generation and power marketing, and
  - oil and gas development and exploration.

CNG, in contrast, was a holding company with predominantly gas utility interests:

- CNG Transmission ("CNGT"), a gas pipeline;
- CNG Retail Services and CNG Power Services, both power marketers;
- various gas local distribution companies; and
- CNG Producing, a gas exploration and production firm.

Before the merger, CNG also owned Virginia Natural Gas, a local distribution company, but it divested that company pursuant to a Consent Order with the Federal Trade Commission. Merger Order, 89 FERC at 61,472–73; see *Dominion Resources, Inc. & Consolidated Natural Gas Co.*, 1999 WL 1336609 (F.T.C. Nov. 1999).

The restrictions that the parties dispute come in the context of FERC's pre-existing generic Standards of Conduct. These limit interactions between gas pipelines and their gas marketing affiliates, with the aim of preventing pipelines from using their monopoly positions to obtain anticompetitive advantages in downstream gas markets. E.g., *Inquiry Into Alleged Anticompetitive Practices Related to Marketing Affiliates of Interstate Pipelines,* Order No. 497, FERC Stats. & Regs. (CCH) ¶ 30,820 (1988) ("Order No. 497"); *Tenneco Gas v. FERC,* 969 F.2d 1187 (D.C.Cir. 1992). Among other things, they prevent pipelines from disclosing nonpublic information preferentially to their affiliates and from otherwise discriminating against non-affiliated shippers. 18 C.F.R. § 161.3. But the rules appear to apply only to a pipeline's relations with its gas marketing affiliates. Compare Notice of Proposed Rulemaking, *Standards of Conduct for Transmission Providers,* 66 Fed.Reg. 50919, 50921, 50923 (2001) (proposing to apply the Standards of Conduct more broadly).

The Commission saw a similar risk in the onset of convergence mergers—that pipelines might use their market power in gas to manipulate downstream electric markets. E.g., *San Diego Gas & Electric Co. and Enova Energy, Inc.,* 79 FERC ¶ 61,372, 1997 WL 346662 (1997) ("*Enova*"). FERC has thus required the gas segments in some convergence mergers, such as one involving San Diego Gas & Electric and Enova Energy, to adhere to specific Codes of Conduct that extend the generic Standards of Conduct to cover gas companies' links with affiliates "with an electric power merchant function." *San Diego Gas & Electric Co. and Enova Energy, Inc.,* 83 FERC ¶ 61,199, at 61,871, 1998 WL 327098 (1998) ("*Enova*").

In seeking Commission approval, Dominion and CNG proposed a narrower set of restrictions—ones applying such a Code of Conduct between the CNG pipeline and "affiliates [1] with wholesale power market-based authority [as opposed to ones selling at prices at cost by regulation] and [2] with whom CNG Transmission conducts transportation transactions." Merger Order, 89 FERC at 61,477. The Commission rejected this version and instead insisted on a Code applying "to the 'corporate family' as a whole," *id.* at 61,478, though offering the firms the alternative of submitting a new analysis of competitive effects. Dominion and CNG accepted the condition. But the composition of the "corporate family as a whole" quickly became a bone of contention. In their acceptance letter Dominion and CNG read the phrase as they believed the Commission had read it in *Enova*, i.e., covering communications between the pipeline and "all affiliates within the corporate family who engage in the wholesale electric merchant function." Letter of Carmen L. Gentile, Counsel for Dominion Resources, to David P. Boergers, Secretary, Federal Energy Regulatory Commission, at 1–3 (Dec. 10, 1999) ("Dominion Acceptance Letter"); see also Code of Conduct Principles Applicable to Dominion Resources, Inc. and Consolidated Natural Gas Company, at

§ 2. The limitation set forth in the letter, of course, was broader than the firms' original proposal, since it included electric affiliates regardless of whether they were free to sell at market rates or whether they transacted directly with CNGT.

In its May 2000 Compliance Order, the Commission rejected Dominion's interpretation of "corporate family." Distinguishing *Enova*, the Commission held that the Merger Order required that the Standards of Conduct be applied "to all energy companies that would be affiliated under the proposed transaction." Compliance Order, 91 FERC at 61,542–43. It directed Dominion to modify its Proposed Code of Conduct accordingly. The Commission denied Dominion's motion for rehearing in November 2000, describing Dominion's arguments as "a collateral attack on the Merger Order." *Dominion Resources, Inc. and Consolidated Natural Gas Company*, 93 FERC ¶ 61,214, at 61,706–707, 2000 WL 1742297 (2000). Dominion filed a petition for review.

Operating under the Commission's order in the meantime, Dominion argued that the Commission should apply a "no-conduit rule" to information received by certain employees. See *Dominion Resources, Inc., Consolidated Natural Gas Co. and Dominion Transmission Inc.*, 93 FERC ¶ 61,284, at 61,954, 2000 WL 1840325 (2000). This would have enabled non-operating staff shared by the pipeline and its affiliated energy companies to receive restricted information (without making contemporaneous disclosure) so long as the employees in fact did not act as conduits. *Id.* The Commission rejected this suggestion, holding that an "automatic imputation rule" was appropriate—any receipt of information by a shared employee would trigger the strictures under the Standards of Conduct as extended by the Compliance Order. *Id.*; see also *Dominion Transmission, Inc.*, 94 FERC ¶ 61,135, 2001 WL

275353 (2001) (denying rehearing and granting clarification). Again, Dominion petitioned for review.

\* \* \*

■ The Commission challenges this court's jurisdiction over the petitions for review. See *Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 1012–13, 140 L.Ed.2d 210 (1998). The Commission argues that the Compliance Order merely implemented the provisions of its earlier Merger Order, so that Dominion was not "aggrieved" as required by the Federal Power Act, 16 U.S.C. § 825l(b), or the Natural Gas Act, 15 U.S.C. § 717r(b). The Commission further notes that insofar as Dominion's claimed injuries were caused by the Merger Order, the relevant time limitations for seeking rehearing and review expired long before Dominion filed any petitions. See 16 U.S.C. § 825l(a)–(b) (establishing 30-day limitations period for applications for rehearing and 60-day period for obtaining judicial review thereafter); 15 U.S.C. § 717r(a)-(b) (same). The Commission thus characterizes Dominion's petition as an impermissible collateral attack on the Merger Order. See, e.g., *City of Nephi v. FERC*, 147 F.3d 929, 934 (D.C.Cir.1998). These jurisdictional arguments are essentially one: If the Compliance Order was merely a "clarification," then Dominion was not aggrieved ˙ by it and is indeed engaging in a collateral attack. In contrast, if the Compliance Order was a "modification," then Dominion clearly has standing to challenge it.

The answer depends on whether a reasonable firm in Dominion's position "would have perceived a very substantial risk that [the Merger Order] meant" what the Commission now says it meant. *ANR Pipeline Co. v. FERC*, 988 F.2d 1229, 1234 (D.C.Cir. 1993); see also 16 U.S.C. § 825l(b) ("No

objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."); 15 U.S.C. § 717r(b) (same). Mere ambiguity in the Merger Order is not enough to excuse Dominion's previous failure to challenge it. See *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 286, 107 S.Ct. 2360, 2369–70, 96 L.Ed.2d 222 (1987) (stating that "the remedy for ... ambiguity is to petition ... for reconsideration," otherwise time limits "would be held hostage to ever-present ambiguities"). Nor is the reasonableness of Dominion's interpretation enough. See *ANR Pipeline*, 988 F.2d at 1233–34. Rather, we ask if the Commission's interpretation was so obscure that the Merger Order "did not provide sufficient notice" to Dominion that it inflicted the now-challenged burden. *East Texas Cooperative v. FERC*, 218 F.3d 750, 754 (D.C.Cir.2000); *Raton Gas Transmission Co. v. FERC*, 852 F.2d 612, 615–16 (D.C.Cir.1988); see also *Sam Rayburn Dam Electric Cooperative v. FPC*, 515 F.2d 998, 1007 (D.C.Cir.1975) (explaining that the rule prevents agencies from "enter[ing] an ambiguous or obscure order, wilfully or otherwise, wait[ing] out the required time, then enter[ing] an 'explanatory' order that would extinguish the review rights of parties prejudicially affected"). "[A] party need not approach every Commission order with paranoia, petitioning for rehearing on account of any conceivable adverse meaning." *ANR Pipeline*, 988 F.2d at 1234.

Here we find that the Commission did not give the required notice. Dominion had little reason to believe that the Commission would interpret the Merger Order so sweepingly as to encompass all energy affiliates. In fact, the Merger Order's language and context overwhelmingly suggested that Dominion's interpretation was correct. The order discussed the comments of only two intervenors, the New York Public Service Commission and Allegheny Energy, and both sought to impose the Standards of Conduct only on links between the pipeline and all *electric* affiliates, not energy affiliates generally. Merger Order, 89 FERC at 61,474/1 ("The New York Commission asserts that the Commission should require the merged company to adhere to standards of conduct between natural gas pipeline companies and affiliate electric companies...."); *id.* at 61,475/1 ("Allegheny ... specifically notes that Applicants' commitment to adopt the pipeline standards of conduct should apply to all affiliates engaged in wholesale sales of electricity....").

A scouring of the agency record—specifically Allegheny's Motion to Intervene and its Motion for Clarification—confirms this interpretation. See, e.g., Motion for Clarification and Permission to Reply, and Reply of Allegheny Energy, *Dominion Resources, Inc. and Consolidated Natural Gas Company*, Docket No. EC99–81–000, at 8–9 (Sept. 8, 1999) ("Allegheny Motion for Clarification") (expressing concern "that CNG's interstate pipeline and local gas distribution company affiliates may share competitively sensitive information already in their possession *with electric affiliates*" (emphasis added)); *id.* at 10–13 (asking that electric employees be required to function independently of gas employees); Motion to Intervene and Request for Conditions of Allegheny Energy, *Dominion Resources, Inc. and Consolidated Natural Gas Company*, Docket No. EC99–81–000, at 13 (Aug. 5, 1999) ("The merger creates increased opportunities and incentives for CNG to share this information with the merged company's electric affiliates....").

Recall that Dominion and CNG had proposed a narrower set of limits to apply

simply between the pipeline and a subset of electric affiliates—"affiliates [1] with wholesale power market-based authority and [2] with whom CNG Transmission conducts transportation transactions." Merger Order, 89 FERC at 61,477–78; see also Allegheny Motion for Clarification, at 6–7. The Commission purported to resolve that dispute in favor of the intervenors. If it intended to go beyond a choice between the competing proposals, a sensible reader would expect it to say so and to say why. It did neither.

Moreover, the Merger Order relied heavily—so far as precedent was concerned, exclusively—on the Commission's *Enova* decision. In the two pages in which the Commission stated and explained its decision, 89 FERC at 61,477–78, it thrice used the phrase, "as we stated in *Enova*" or its equivalent ("as we discussed in *Enova*"). And the Merger Order used operative language exactly matching that of the *Enova* decision:

> Therefore, the Applicants would need to revise their commitment so that the standards of conduct requirements apply to the "corporate family" as a whole.

Merger Order, 89 FERC at 61,478.

> Therefore, the Applicants would need to revise their commitment so that the [Order No. 497] restrictions and requirements would be applicable to the corporate family as a whole....

*Enova*, 79 FERC at 62,595. Obviously the only difference is that in the Merger Order the phrase corporate family is put in quotes, in apparent homage to *Enova*. Yet, in *Enova*, the Commission ultimately required that the Standards of Conduct be applied only "to any affiliate in the corporate family with an electric power merchant function." *Enova*, 83 FERC at 61,-871.

Before us the Commission relies heavily on some language not including the qualifier "electric," such as "all the merged company's affiliates," "any combination of the energy companies that would be affiliated," and " 'corporate family' as a whole." *Id.* at 61,477–78. But the context suggests that this language assumed "electric" as an implicit limitation. For example, the Commission rejected applying the Standards of Conduct to only "market-based" affiliates because "the merged company's affiliates with cost-based rates could unduly profit from higher *electricity* prices when market rates are less than cost-based rates." *Id.* at 61,478/1 (emphasis added). Indeed, the *Enova* merger order also used vague terms to describe the Commission's concerns, expressing concern over "the potential for abuse between any combination of the energy companies that would be affiliated." *Enova*, 79 FERC at 62,565. It is hardly surprising, then, that concurring FERC Commissioner Hébert unequivocally read the Merger Order to cover only links to electric affiliates:

> This order requires the applicants for a merger to submit a new analysis or to accept Standards of Conduct applying to all electric affiliates. (The applicants offered only those with market-based rates.)

Merger Order, 89 FERC at 61,482 (Hébert, Comm'r, concurring).

The reasonableness of the Compliance Order's interpretation also sheds light on the likelihood that Dominion would have anticipated it. Here, of course, the jurisdictional question merges somewhat with the merits, for the predictability of a Commission position is related to its defensibility. Further, *if* the Commission's late-revealed distinction of *Enova* were very powerful, that would operate both to justify the Compliance Order's much more stringent terms and to undermine Dominion's understanding that the words used in *Enova* would have the same meaning when used in the Merger Order; if the distinc-

tion were plain, the reader would have to infer that only a loose analogy was meant.

■ In fact the Compliance Order's insistence that the Standards of Conduct be imposed on "all energy affiliates," rather than only "electric affiliates," represents a sharp and unexplained break with FERC precedent and is otherwise arbitrary and capricious. See *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C.Cir.1995) ("[W]here an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious.").

The Commission's attempts to distinguish *Enova* are rather thin. It principally stresses that the Dominion merger involves several separate gas local distribution companies ("LDCs"), whereas the LDCs in the Enova merger were part of other entities explicitly covered by the Standards of Conduct or the merger-related Code of Conduct. Compliance Order, 91 FERC at 61,542 n.11. These separate LDCs in the present merger would be subject to neither the generic Standards of Conduct at 18 C.F.R. § 161.3, because they are not pipelines, nor § 2 of Dominion's Proposed Code of Conduct, because they are not electric affiliates. The LDCs thus "could be used to engage in some of the improper sharing of competitively-sensitive information and other abuses (e.g., failing to offer the same discounts to affiliates and nonaffiliates, and not processing all similar requests for service in the same manner)." Compliance Order, 91 FERC at 61,542/2.

An LDC loophole may very well exist, but it is hardly as large as the Commission suggests. The Compliance Order completely fails to acknowledge that Sections 4 and 5 of Dominion's Proposed Code of Conduct ("PCC") impose restrictions on Dominion's LDCs that are almost completely analogous to those imposed on pipelines under 18 C.F.R. § 161.3:

Section 4:

(i) Any employee engaged in the wholesale merchant function is prohibited from obtaining or receiving from an affiliated LDC any information that the affiliated LDC receives from any non-affiliated shipper or any potential non-affiliated shipper on its system.

(ii) Any employee engaged in the wholesale merchant function is prohibited from obtaining or receiving from an affiliated LDC information related to transportation of natural gas that is not contemporaneously provided to all potential shippers, affiliated and non-affiliated, on the affiliated LDC's system.

(iii) Any employee engaged in the wholesale merchant function is prohibited from obtaining or receiving indirectly from any other employees of any affiliate information which the employee engaged in the wholesale merchant function is prohibited from obtaining or receiving directly from an affiliated LDC under clauses (i) and (ii).

(iv) To the maximum extent practicable, employees engaged in the wholesale merchant function will function independently of an affiliated LDC's operating employees.

Section 5:

The Applicants further commit that no affiliated LDC will unduly discriminate in favor of any actual or potential affiliated electric generator and against any actual or potential non-affiliated electric generator regarding service availability, tariff provisions containing the rate and non-rate conditions of service, and/or the application and enforcement of any tariff provision.

Sections 4 and 5 require LDCs to keep to themselves (i.e., not disclose to any power merchant affiliate) information received from non-affiliated shippers, compare PCC § 4(i) with 18 C.F.R. § 161.3(e), to disclose information related to gas transportation to all shippers contemporaneously (if disclosed at all), compare PCC § 4(ii) with 18 C.F.R. § 161.3(f), to separate "[t]o the maximum extent possible" LDC employees from those engaged in the wholesale merchant function, compare PCC § 4(iii) with 18 C.F.R. § 161.3(g), and to apply tariff provisions and to process requests for transportation without discrimination, compare PCC § 5 with 18 C.F.R. § 161.3(a)-(d). A threat exists only insofar as an LDC might become a conduit by which *pipeline information* can reach electric affiliates: Section 4(i) is ineffective because it only prohibits LDCs from disclosing information received directly by the LDC from non-affiliated shippers. Section 4(ii) is possibly ineffective because its contemporaneous disclosure rule applies only to information related to gas transportation. And Section 4(iii) is irrelevant because it prohibits other affiliates from becoming conduits of LDC information; it provides no additional protection against LDCs becoming conduits of pipeline information.

In addressing this conduit problem, however, the Commission has used a tank to block a mousehole. Ordinarily, of course, the Commission is entitled to some deference on its choice of remedy. But the Compliance Order goes much further than any apparent need or any cure of the subtle distinction between this case and *Enova*. It prohibits the pipeline from sharing information with any affiliated energy company, whether it is an LDC or not. The Commission offers no justification for such a broad limitation.

Further, the Compliance Order destroys pre-merger integrations and their accompanying efficiencies, a change the Commission never justifies or explains. Before the merger, CNGT was subject only to the generic Standards of Conduct applicable between pipelines and their marketing affiliates; it was thus able to share information and employees with its gas exploration and production firm. Under the Compliance Order, however, this sharing is now proscribed. But the *logic* of correcting anticompetitive hazards posed by a merger implicitly suggests remedies only *between* the merging companies. After all, the most severe remedy available to an agency is outright prohibition of the merger, the ultimate in Chinese walls between the two entities. The Compliance Order, however, creates barriers *within* the pre-existing entities, without explanation. Of course, if the Commission has a general case for broader restrictions, it can make that case in the rulemaking that it has launched to expand the generic Standards of Conduct to "govern the relationships between the transmission providers and all of their energy affiliates, not just those engaged in marketing or sales functions." Notice of Proposed Rulemaking, 66 Fed.Reg. at 50,-922/2 (2001).

Finally, we need not reach Dominion's "no-conduit" rule arguments. Since we vacate the Compliance Order, the only employees subject to the Standards of Conduct will be those shared between the pipeline and its (gas or electric) marketing affiliates. Dominion already concedes that those employees should "be bound by the stricter 'automatic imputation' rule." Dominion Brief at 35–36 & n.17.

* * *

In sum, the Merger Order was obscure enough that Dominion could not reasonably have been expected to anticipate the Commission's later interpretation. Dominion therefore has standing to challenge

the Compliance Order. In addition, the Commission's insistence that the Standards of Conduct be applied to all affiliated energy companies is an unexplained and unjustified departure from precedent. The Compliance Order is therefore arbitrary and capricious.

We vacate the Compliance Order and remand to the Commission for proceedings consistent with this opinion.

*So ordered.*