# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued September 11, 2006     Decided November 17, 2006

No. 04-1183

NATIONAL FUEL GAS SUPPLY CORPORATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK,
ET AL.,
INTERVENORS

————

Consolidated with
04-1302, 04-1318, 04-1338, 05-1042, 05-1048, 05-1051,
05-1052, 05-1055

————

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

————

*Howard L. Nelson* argued the cause for Interstate Gas Pipeline Company Petitioners. With him on the briefs were *Joan Dreskin, Timm Abendroth, Janice A. Alperin, Mark C. Schroeder, David W. Reitz,* and *Kenneth B. Driver*. *Richard D. Avil, Jr.* entered an appearance.

*Christopher J. Barr* argued the cause for Local Distribution Company Petitioners. With him on the briefs were *Anne K. Kyzmir*, *Jeffrey M. Petrash, William A. Williams*, and *David W. Reitz*. *Michael A. Reville* entered an appearance.

*Lawrence G. Acker* argued the cause for petitioner Calypso U.S. Pipeline, LLC. With him on the briefs was *Brett A. Snyder*.

*Samuel Soopper*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *John S. Moot*, General Counsel, and *Robert H. Solomon*, Solicitor.

Before: GINSBURG, *Chief Judge*, and GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: The Natural Gas Act of 1938 provides that "[n]o natural-gas company shall, with respect to any transportation or sale of natural gas . . . make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage." 15 U.S.C. § 717c(b)(1). The Act's fundamental purpose is to protect natural gas consumers from the monopoly power of natural gas pipelines. *See Associated Gas Distribs. v. FERC*, 824 F.2d 981, 995 (D.C. Cir. 1987). Congress has directed the Federal Energy Regulatory Commission to enforce the statute and regulate the pipelines. Since the 1980s, FERC has done so primarily through open-access rules that require pipelines to carry gas on equal terms and not to grant undue preferences or discriminate in favor of gas sold by the pipeline itself. *See id.* at 996; *United Distribution Cos. v. FERC*, 88 F.3d 1105, 1123-27 (D.C. Cir. 1996).

In 1988, acting pursuant to its statutory authority, FERC issued Standards of Conduct to regulate natural gas pipelines' interactions with their "marketing affiliates." (Marketing affiliates are the separate affiliates of pipelines that sell natural gas; the affiliates arrange to purchase gas at the wellhead and to transport and distribute it to buyers.) The Standards required pipelines and their marketing affiliates to function independently and imposed restrictions on the sharing of information between them. FERC promulgated those rules because of (i) the theoretical threat that pipelines would favor their marketing affiliates by selectively divulging information about pipeline operations, thereby impeding market competition; and (ii) a factual record consisting of complaints by other sellers who were competing with pipelines' marketing affiliates and of documented abuses by pipelines and their marketing affiliates.

The pipelines petitioned for review, but we denied the petition in relevant part. We recognized that FERC must take into account the substantial efficiencies and benefits of vertical integration. We nonetheless upheld the Order because FERC had sufficiently demonstrated both a theoretical threat of pipelines granting undue preferences to their marketing affiliates and substantial record evidence of actual abuse. *See Tenneco Gas v. FERC*, 969 F.2d 1187, 1197 (D.C. Cir. 1992).

In 2004, FERC significantly revised and extended the Standards so that they would apply to pipelines' relationships not only with marketing affiliates but also with other entities in the industry (such as producers, gatherers, processors, and traders) that are affiliated with pipelines. In vastly expanding the reach of the Standards, FERC again relied on both a claimed theoretical threat – this time, of pipelines granting undue preferences to those non-marketing affiliates – and record evidence that, according to FERC, indicated that abuse by pipelines and non-marketing affiliates was a real problem in the

industry. The two dissenting FERC Commissioners objected, however, that the factual record on which FERC relied was barren and did not contain a single example of abuse involving non-marketing affiliates, much less evidence of an industry-wide problem.

Several pipelines petitioned for review in this court. We conclude that FERC's asserted factual premises do not withstand scrutiny and that the Order does not reflect the reasoned decisionmaking required by the Administrative Procedure Act. We therefore hold that the Order is arbitrary and capricious as applied to natural gas pipelines. We will grant the petition, vacate the Order as applied to natural gas pipelines, and remand. Because of our disposition, we need not consider the separate arguments against the Order raised by Calypso U.S. Pipeline and the local natural gas distribution companies.

I

1. The natural gas supply chain consists of a variety of entities. Some of them, such as producers, gatherers, processors, pipelines, and local distribution companies, perform the physical processes required to extract, refine, transport, and distribute gas. Other entities, such as marketers and traders, operate on the financial side, coordinating sales and trading in the natural gas commodity market.

Producers establish new wells and extract natural gas from the ground. Gatherers transport the gas from the wellhead to a processing plant. From there, processors distill "pipeline quality" natural gas by removing various hydrocarbons and fluids (some processing is done initially at the wellhead or later in the supply chain). Natural gas pipelines (either intrastate or interstate) carry gas to local distribution companies and to large industrial and commercial customers. Finally, local distribution

companies deliver gas to retail consumers, subject to price regulation by state utility commissions.

Natural gas marketers sell natural gas and oversee the steps needed to arrange transportation of gas from the wellhead to the end-user. Frequently affiliated with another entity (such as a producer or pipeline), marketers identify customers, arrange gas transportation and storage, and ensure that adequate supplies are available to satisfy the purchasers' demand.

In recent years, entities referred to as natural gas traders have actively participated in the natural gas spot market and the natural gas derivatives market. In the spot (or physical) market, traders enter into contracts for the near-term delivery of natural gas. In the derivatives market, traders buy and sell derivative instruments like futures that are based on the underlying natural gas commodity. Traders participate in those markets primarily to hedge against risk or to profit from speculation on future price changes.

2. Like railroads, water pipelines, cable television lines, and telephone lines, natural gas pipelines traditionally have been considered natural monopolies. In other words, the costs of entering the market are so high (because of the large fixed cost of building a pipeline) that it is most efficient for only one firm to serve a given geographical region. *See* RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW § 12.1, at 343-46 (4th ed. 1992); *see also United Distribution Cos. v. FERC*, 88 F.3d 1105, 1122 & n.4 (D.C. Cir. 1996); *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1010 (D.C. Cir. 1987). As natural monopolies, pipelines if unregulated would possess the ability to engage in monopolistic pricing for transportation services and discriminate against unaffiliated entities that seek to transport gas.

As this court has explained, federal regulation of the natural gas industry is "designed to curb pipelines' potential monopoly power over gas transportation." *United Distribution Cos.*, 88 F.3d at 1122. Federal regulation began in 1938 after Congress passed and President Franklin Roosevelt signed the Natural Gas Act. 52 Stat. 821 (codified as amended at 15 U.S.C. §§ 717 *et seq.*). That Act conferred jurisdiction on FERC's predecessor, the Federal Power Commission, to regulate the interstate transportation and sale of natural gas. *See* 15 U.S.C. §§ 717(b), 717d(a). The Act also established a certification system and required the Commission to ensure that all rates were "just and reasonable" and that natural gas companies did not grant "undue preference[s]." *See id.* §§ 717c, 717d, 717f(c)(1)(a). Under this system, the Commission for decades regulated both the wellhead price and the "city gate price" (the price charged by pipelines to end-users and local distribution companies). *See generally* STEPHEN G. BREYER & PAUL W. MACAVOY, ENERGY REGULATION BY THE FEDERAL POWER COMMISSION 56-88 (1974).

In 1978, Congress passed and President Carter signed the Natural Gas Policy Act, Pub. L. No. 95-621, 92 Stat. 3350. That Act began the gradual deregulation of prices at the wellhead. In the aftermath of the Act and as a result of other legal and economic developments in the early 1980s, FERC launched a new regulatory approach. The Commission concluded that it could best fulfill the statutory purposes by allowing customers to purchase gas at the wellhead free from regulation and by preventing pipelines from abusing their monopoly power over the transportation of gas. At the time, pipelines served not just as transporters of gas but also as the primary gas marketers: They would purchase gas at the wellhead themselves, transport it over their systems, and sell it to local distribution companies or other end-users. *See Associated Gas Distribs.*, 824 F.2d at 993. The problem was that pipelines could exclude third parties

from using the transmission facilities when pipelines wanted to favor the pipelines' own sales. *See id.*

To achieve its regulatory goals, FERC issued its landmark Order 436 in 1985. *See* Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, Order No. 436, F.E.R.C. Stats. & Regs. ¶ 30,665, 50 Fed. Reg. 42,408 (1985) (rehearing orders omitted). Order 436 declared the bundling of transportation and marketing services "unduly discriminatory" and conditioned "blanket certification" (which allowed pipelines to avoid costly individual certifications) on non-discriminatory "open access" to pipelines' transmission facilities. The Order served to help deregulate the *sales* market, where there are no natural barriers to market competition, while simultaneously preventing anti-competitive activity by the monopolistic pipelines in the *transportation* market. This court upheld the regulatory scheme as consistent with FERC's authority to prevent natural gas companies from granting undue preferences. *See Associated Gas Distribs.*, 824 F.2d at 1044 (approving bulk of Order); Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, Order No. 500, F.E.R.C. Stats. & Regs. ¶ 30,761, 52 Fed. Reg. 30,334 (1987) (readopting in large part Order 436); *Am. Gas Ass'n v. FERC*, 888 F.2d 136, 153 (D.C. Cir. 1989) (remanding record of Order 500); *Am. Gas Ass'n v. FERC*, 912 F.2d 1496, 1503, 1520 (D.C. Cir. 1990) (largely upholding additional Orders 500-H and 500-I).

In 1992, FERC followed up on Order 436 by issuing Order 636, which fully mandated the unbundling of transportation and marketing by directly requiring pipelines to offer transportation service on a non-discriminatory basis. *See* Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation; and Regulation of Natural Gas Pipelines After Wellhead Decontrol, Order No. 636, F.E.R.C. Stats. & Regs. ¶ 30,939, 57 Fed. Reg. 13,267 (1992) (rehearing

orders omitted). We upheld that Order in large part. *See United Distribution Cos.*, 88 F.3d at 1191.

3. In the 1980s, as FERC unbundled interstate pipelines' marketing and transportation functions by requiring pipelines to transport gas on equal terms, pipelines began to withdraw from the sales market for a variety of legal and economic reasons. *See Tenneco Gas v. FERC*, 969 F.2d 1187, 1193 (D.C. Cir. 1992). Instead of selling gas directly, pipelines established marketing affiliates that would sell gas in a competitive market free from regulation. Before long, however, non-affiliated marketers objected that pipelines – while providing equal and open access to sellers – were violating that principle in spirit by granting their marketing affiliates undue preferences, such as by divulging inside information regarding future capacity that would provide competitive benefits to pipelines' affiliates. *See id.* at 1194.

In response to pipelines' undue favoritism toward their marketing affiliates, FERC promulgated Order 497, which set out Standards of Conduct to govern the relationship between pipelines and their marketing affiliates. *See* Inquiry Into Alleged Anticompetitive Practices Related to Marketing Affiliates of Interstate Pipelines, Order No. 497, F.E.R.C. Stats. & Regs. ¶ 30,820, 53 Fed. Reg. 22,139 (1988) (rehearing orders omitted). Order 497 required pipelines to provide equal treatment to sellers in areas such as scheduling, transportation, and speed of service; ordered contemporaneous disclosure of transportation information to all potential shippers if disclosed to an affiliate; and required independent functioning of pipeline and marketing affiliate employees. *See Tenneco*, 969 F.2d at 1194-95.

Order 497 was narrowly targeted in certain important respects. First, FERC chose not to extend the Standards to

relationships with *non-marketing* affiliates, such as producers, gatherers, and processors. FERC concluded that imposing the Standards on relationships with non-marketing affiliates was unnecessary because of "the absence of evidence of abusive practices" between pipelines and non-marketing affiliates and "in light of the availability of complaint procedures for aggrieved persons." Order 497, at 31,130. Second, the Order did not apply to pipelines that do not conduct any transactions with their marketing affiliates. FERC found that "there is no possibility for abuse of the pipeline-marketing affiliate relationship where the pipeline and marketing affiliate do not conduct any transactions with each other." *Id.* at 33,131.

Pipelines and other entities filed petitions in this court challenging the contemporaneous disclosure and independent functioning requirements of Order 497. *See Tenneco*, 969 F.2d at 1195-96. We began by stating that vertical integration in the natural gas industry produces benefits for consumers and that FERC must take those benefits into account when regulating the pipelines. *See id.* at 1197-99. We nonetheless upheld the contemporaneous disclosure requirement with respect to transportation information because the record demonstrated both a straightforward theoretical threat of abuse and substantial record evidence that pipelines had been granting their marketing affiliates undue preferences. *See id.* In light of the theoretical threat and the record of abuse, we also upheld the independent functioning requirement, noting that it preserved some benefits of vertical integration, particularly in contrast to the more draconian possibilities of complete physical separation, divorcement, or divestiture. *Id.* at 1204, 1209.

4.   Some nine years later, in 2001, FERC considered taking a step it had rejected in Order 497. FERC issued a notice of proposed rulemaking announcing its plan to broaden "the definition of an affiliate covered by the standards of conduct" to

include *non-marketing* affiliates. *See* Notice of Proposed Rulemaking, Standards of Conduct for Transmission Providers, F.E.R.C. Stats. & Regs. ¶ 32,555, at 34,079, 66 Fed. Reg. 50,919 (Sept. 27, 2001); *id.* at 34,090. FERC cited its concern "that a transmission provider's market power could be transferred to its affiliated businesses because the existing rules do not cover all affiliate relationships" and pointed to "[s]ignificant changes" in the range of services offered by various companies in the natural gas industry. *Id.* at 34,081-34,082. The notice of proposed rulemaking indicated that the industry-wide costs of compliance with the Standards could be $240 million per year – a cost that eventually would be borne in part by consumers. *See id.* at 34,090.

In their comments, the pipelines suggested that the proposal was "perhaps a solution in search of a problem." Comments of Interstate Natural Gas Association of America (Dec. 20, 2001) at 1. After receiving input from the pipelines, other industry participants, and various organizations, FERC went ahead and promulgated Order 2004 in November 2003. *See* Standards of Conduct for Transmission Providers, Order No. 2004, F.E.R.C. Stats. & Regs. ¶ 31,155, 68 Fed. Reg. 69,134 (Nov. 25, 2003). FERC conducted four more rounds of notice and comment to clarify various aspects of the new regulations. *See* Order No. 2004-A, F.E.R.C. Stats. & Regs. ¶ 31,161, 69 Fed. Reg. 23,562 (Apr. 16, 2004); Order No. 2004-B, F.E.R.C. Stats. & Regs. ¶ 31,166, 69 Fed. Reg. 48,371 (Aug. 2, 2004); Order No. 2004-C, F.E.R.C. Stats. & Regs. ¶ 31,172, 70 Fed. Reg. 284 (Dec. 21, 2004); Order No. 2004-D, 110 FERC ¶ 61,320 (Mar. 23, 2005). (For ease of reference, we will refer to these Orders collectively as "Order 2004.")

FERC based the new Standards on the same principles of non-discrimination and independent functioning as the old Standards. *See* Standards of Conduct for Transmission

Providers, 18 C.F.R. § 358.2 (2006); *Tenneco*, 969 F.2d at 1194-95. The central provisions are:

*(a) Independent Functioning.* A pipeline's employees who engage in transmission operations ordinarily "must function independently of [its] Marketing or Energy Affiliates' employees," with an exception for "emergency circumstances." 18 C.F.R. § 358.4(a)(1)-(2). Further, a pipeline generally may not permit its affiliates' employees to engage in transmission system operations or reliability functions or to access the system control center. *Id.* § 358.4(a)(3)(i)-(ii).

*(b) Non-discrimination.* A pipeline must ensure that its affiliates' employees have access only to the information available to all transmission customers and that such employees are prevented from obtaining non-public information about the pipeline's transmission system. *Id.* § 358.5(a).

*(c) Posting Requirements.* A pipeline must post online such information as the names and addresses of its affiliates, the organizational structure of its parent corporation, a list of facilities shared with affiliates, a list of business units and job descriptions, a schedule for implementing the Standards, and a written log "detailing the circumstances and manner in which [the pipeline] exercised its discretion under any terms of [its] tariff." *Id.* §§ 358.4(b)(1)-(3), (e)(1), 358.5(c)(4).

Order 2004 ushers in two fundamental changes from Order 497. First, it extends the Standards beyond pipelines' relationships with their *marketing* affiliates to govern also pipelines' relationships with numerous *non-marketing* affiliates – processors, gatherers, producers, local distribution companies, and traders. *See* Order 2004, at 30,825-30,827. The Order includes a broad, multipart definition of Energy Affiliate as an affiliate that "(1) Engages in or is involved in transmission

transactions in U.S. energy or transmission markets; or (2) Manages or controls transmission capacity of a Transmission Provider in U.S. energy or transmission markets; or (3) Buys, sells, trades or administers natural gas or electric energy in U.S. energy or transmission markets; or (4) Engages in financial transactions relating to the sale or transmission of natural gas or electric energy in U.S. energy or transmission markets." 18 C.F.R. § 358.3(d)(1)-(4). The definition also includes local distribution companies, other than those that make only on-system sales (where the point of delivery is on or directly interconnected with the local distribution company's distribution system). *Id.* § 358.3(d)(5), (d)(6)(v).

Second, the new Standards cover a pipeline's relationships even with those affiliates that do not hold or control any capacity on the pipeline. *See id.* §§ 358.1(a), 358.3(d). For example, a pipeline is subject to the Standards in its relationship with an affiliated producer that transports gas only on *other* pipelines. FERC's apparent rationale was that pipelines could communicate information to affiliates who in turn could profit in the natural gas financial markets. FERC believed that a pipeline could, for instance, inform its affiliate of an upcoming transmission constraint that would affect the price of the commodity in the New York Mercantile Exchange, enabling the affiliate to enter into a profitable futures contract and gain a competitive advantage. *See* Order 2004, at 30,827-30,828.

Two FERC Commissioners strongly disagreed with FERC's new intervention in the natural gas market. Commissioner Kelliher stated that "the flaw in the Standards of Conduct Final Rule is the lack of record evidence to support expanding the scope beyond Marketing Affiliates." Order 2004-A, at 31,225 (statement of Kelliher, Comm'r, dissenting in part). In his view, "suspicion is not a sufficient basis for expanding the scope of Standards of Conduct beyond Marketing Affiliates."

*Id.* He explained that the record evidence of abuse related to marketing affiliates, not non-marketing affiliates, and stated: "I do not see how a record of affiliate abuse limited to Marketing Affiliates argues in favor of expanding the scope of the rule beyond Marketing Affiliates. To my mind, it argues in favor of keeping the scope of the rule where it was. Indeed, there appears to be no factual basis to support expanding the scope beyond Marketing Affiliates." *Id.* Finally, citing this court's decision in *Dominion Resources, Inc. v. FERC*, 286 F.3d 586 (D.C. Cir. 2002), Commissioner Kelliher expressed his concern that the Order would diminish industry efficiencies without advancing the FERC policy of preventing unduly discriminatory behavior. Order 2004-A, at 31,226 (statement of Kelliher, Comm'r, dissenting in part). Commissioner Brownell also dissented. She stated that there was "insufficient evidence to support eliminating the exemption for affiliated producers, gatherers, and processors." Order 2004, at 30,860 (statement of Brownell, Comm'r, dissenting in part).

Several entities timely filed petitions for review in this court. They include the Interstate Natural Gas Association of America, a trade group that represents interstate pipelines. (No electric utilities petitioned for review of the Standards as applied to them.) Invoking the standards in the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, the petitioners challenge multiple aspects of the Orders: (1) the extension of the Standards to non-marketing affiliates; (2) the extension of the Standards to entities that do not hold or control capacity on their affiliated pipelines, including the elimination of the exemption for local distribution companies that make off-system sales only on non-affiliated pipelines; (3) the favorable treatment of local distribution companies as compared to producers, gatherers, and processors with respect to the exemption for local distribution companies that make only on-system sales; (4) the restriction of the activities of risk management employees and lawyers; and

(5) the waiver log requirement. In addition, petitioner Calypso U.S. Pipeline challenges the application of the Standards to a certificate holder that has not commenced the transportation of natural gas but has begun soliciting business. We have jurisdiction under 15 U.S.C. § 717r(b).

## II

1. The Administrative Procedure Act governs our analysis. We review FERC's Order to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's "policy decisions are entitled to deference so long as they are reasonably explained." *Covad Communications Co. v. FCC*, 450 F.3d 528, 539 n.6 (D.C. Cir. 2006). Under the arbitrary and capricious prong of the standard, we must ensure that FERC has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). "Normally, an agency rule would be arbitrary and capricious if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency." *Id.* The APA "establishes a scheme of 'reasoned decisionmaking.'" *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quoting *State Farm*, 463 U.S. at 52).

We also adhere to the principle set out in *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943): "[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." *See also La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 898 (D.C. Cir. 1999); *Consol. Edison Co. of N.Y. v. FERC*, 823 F.2d 630, 641 (D.C. Cir. 1987). We will neither

supply our own justifications for an order nor uphold an order based on FERC's post hoc rationalizations. *See EchoStar Satellite, L.L.C. v. FCC*, 457 F.3d 31, 36 (D.C. Cir. 2006). An important corollary is that where FERC has relied on multiple rationales (and has not done so in the alternative), and we conclude that at least one of the rationales is deficient, we will ordinarily vacate the order unless we are certain that FERC would have adopted it even absent the flawed rationale. *See Consol. Edison Co. of N.Y.*, 823 F.2d at 641-42; *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

To justify Order 2004, FERC has relied on both an asserted theoretical threat of undue preferences and a claimed record of abuse. The Commission did not seek to justify the Order based *solely* on the theoretical danger. Therefore, if we find that the claimed record evidence does not support the Order, we cannot uphold it. *See Chenery*, 318 U.S. at 95.

2. In *Tenneco*, we carefully examined FERC's adoption of Standards of Conduct to govern relationships between pipelines and their *marketing* affiliates. Our analysis in that case guides our evaluation of Order 2004's extension of the Standards of Conduct to relationships between pipelines and their *non-marketing* affiliates.

We began by emphasizing that vertical integration creates efficiencies for consumers. *See Tenneco Gas v. FERC*, 969 F.2d 1187, 1197 (D.C. Cir. 1992) ("In a competitive market, the efficiencies of the pipeline-affiliate relationship should produce benefits for consumers.") (citing 3 P. AREEDA & D. TURNER, ANTITRUST LAW ¶ 725d, at 201 (1978)). *See generally* ROBERT H. BORK, THE ANTITRUST PARADOX 225-31 (2d ed. 1993). As to vertical information sharing, we stated that "the sharing of information between pipelines and their marketing affiliates has

efficiency benefits." 969 F.2d at 1197. In considering structural separation requirements, we similarly recognized that "there are efficiencies to be derived from such integration and any separation reduces those benefits to some extent." *Id.* at 1205.

We pointed out that the Commission, by contrast, "appear[ed] to believe that *any* advantage a pipeline gives its marketing affiliate is improper." *Id.* at 1201. We rejected this theory and explained that "advantages a pipeline gives its affiliate are improper only to the extent that they flow from the pipeline's anti-competitive market power. Otherwise vertical integration produces permissible efficiencies that 'cannot by themselves be considered uses of monopoly power.'" *Id.* (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 276 (2d Cir. 1979)).

*Tenneco* thus stands for the proposition that FERC cannot impede vertical integration between a pipeline and its affiliates without "adequate justification." *See* 969 F.2d at 1199. We upheld Order 497 in relevant part because FERC presented an adequate justification – by advancing *both* (i) a plausible theoretical threat of anti-competitive information-sharing between pipelines and their marketing affiliates *and* (ii) vast record evidence of abuse.

As to the theoretical threat, we accepted FERC's explanation "that there is at least a theoretical danger that pipelines will favor their marketing affiliates in providing information, and that the result would be anti-competitive." *Id.* at 1197. FERC had relied on a Department of Justice report that stated: "The affiliate relationship . . . creates an incentive for the pipeline to withhold information that otherwise would be made available to the affiliate's competitors. Withholding this information from non-affiliated shippers reduces their ability to arrange transactions efficiently." *Id.* (quoting Comments of the

United States Department of Justice in Response to the Notice of Inquiry (Dec. 29, 1986) at 15). The threat of pipelines enabling their affiliates to secure capacity sooner than their competitors or otherwise to benefit from non-public knowledge about the transmission system was readily apparent – and this threat stemmed from the pipelines' monopoly position.

As to record evidence, we explained that "[t]he record also contains evidence that the discriminatory and anti-competitive distribution of information is not just a theoretical danger, *but a real one*." *Id.* at 1197 (emphasis added); *see also id.* (recounting representative example of non-affiliated marketer that lost out on capacity when pipeline apprised affiliate of availability of capacity before disclosing that information to affiliate's rivals); *id.* (citing pipeline's disclosure in record that it had provided information to its marketing affiliate, which may have allowed the affiliate to displace existing sales). The rulemaking had been prompted by "unaffiliated marketers [that] complained to FERC that pipelines were granting unfair preferences to their affiliates by, among other things, providing inside information on pipeline capacity." *Id.* at 1194. Order 497 also relied upon "instances of abuse actually adjudicated by the Commission." Order 497, at 31,128.

3. In issuing Order 2004, as well as in defending that Order before this court, FERC has relied on what it asserts is a record of abuse between pipelines and their *non-marketing* affiliates. FERC has asserted that the record here is similar to the record of abuse found in Order 497 between pipelines and their *marketing* affiliates. *See* Order 2004, at 30,821 (responding to comments arguing that there have been few cases of abuse by citing agency investigations uncovering unfairly preferential treatment toward marketing affiliates); Order No. 2004-A, at 31,179 ("In the past, agency arrangements have been abused."); *id.* at 31,181 ("Unduly preferential behavior can and does harm

customers."); Respondent's Br. at 27 ("[The] suggestion that the Commission in this proceeding based its Energy Affiliate rule on mere conjecture [is] totally unfounded. In fact, the record contains numerous supporting comments . . . identifying affiliate relationships with natural gas pipelines as a breeding ground for undue discrimination."); *id.* at 8 ("The Standards of Conduct proposed by the Commission in 2001 relied on the same general principles as those upheld by this court in *Tenneco*."); *id.* at 16 (asserting that Order 2004 is based on "substantial evidence in the record"); *id.* at 20 (Order 2004 must be and is "based upon the record" and supported by "substantial evidence.").

At the outset, we take note of the assessment of the two dissenting FERC Commissioners. They claimed that FERC was relying on a record of abuse that in fact did not exist. Commissioner Kelliher stated that "the flaw . . . is the lack of record evidence to support expanding the scope beyond Marketing Affiliates." Order 2004-A, at 31,225 (statement of Kelliher, Comm'r, dissenting in part). He added: "I do not see how a record of affiliate abuse limited to Marketing Affiliates argues in favor of expanding the scope of the rule beyond Marketing Affiliates. To my mind, it argues in favor of keeping the scope of the rule where it was. Indeed, there appears to be no factual basis to support expanding the scope beyond Marketing Affiliates." *Id.* Commissioner Brownell similarly stated that there was "insufficient evidence to support eliminating the exemption for affiliated producers, gatherers, and processors." Order 2004, at 30,860 (statement of Brownell, Comm'r, dissenting in part).

Our review of the record on which FERC relied reveals that Commissioners Kelliher and Brownell were plainly correct: Unlike in Order 497, FERC here has provided no evidence of a real problem with respect to pipelines' relationships with non-marketing affiliates. Indeed, Order 2004 does not include a

single example of abuse by non-marketing affiliates. Nor does the record disclose complaints from competitors of pipelines' non-marketing affiliates. Rather, FERC relied on either examples of abuse by *marketing* affiliates (already covered by the old Standards) or comments from the rulemaking that merely reiterated a *theoretical* potential for abuse.

A review of some of the primary evidence cited by FERC helps demonstrate the flaws in its reasoning.

• FERC explained that the Enforcement Division of its Office of Market Oversight and Investigations had "uncovered affiliate abuse activity that reveals that some Transmission Providers are giving their affiliates undue preferences and violating the standards of conduct." Order 2004, at 30,821; *see also* Order 2004-A, at 31,179-31,180. That supposed "activity" provides no support for Order 2004 for the simple reason that all of the cases listed addressed undue preferences granted to *marketing* affiliates. *See Transcon. Gas Pipe Line Corp.*, 102 FERC ¶ 61,302 (2003); *Nat'l Fuel Gas Supply Corp.*, 103 FERC ¶ 61,192 (2003); *Idaho Power Corp.*, 103 FERC ¶ 61,182 (2003); *Cleco Corp.*, 104 FERC ¶ 61,125 (2003). Those decisions have no bearing on whether the Standards should be extended to relationships with *non-marketing* affiliates. Like Commissioner Kelliher, we do not see how "a record of affiliate abuse limited to Marketing Affiliates argues in favor of expanding the scope of the rule beyond Marketing Affiliates." Order 2004-A, at 31,225 (statement of Kelliher, Comm'r, dissenting in part).

• The Commission identified one case involving a non-marketing affiliate (a gatherer). *See* Order 2004, at 30,832 & n.33 (citing *Shell Offshore Inc. v. Transcon. Gas Pipe Line Corp.*, 100 FERC ¶ 61,254 (2002)). But that evidence does not help FERC: This court's subsequent review of that proceeding

expressly rejected the contention that the affiliate relationship between the gatherer and a pipeline was related to the alleged abuse. *See Williams Gas Processing – Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335, 1342-43 (D.C. Cir. 2004).

• FERC cited comments from the California Public Utilities Commission (CPUC). The CPUC, however, did not identify any actual examples of wrongdoing. The CPUC stated that pipelines with affiliates are subject "to criticism as serving not the public interest of providing competitive, open-access transportation services . . . ." Comments of the California Public Utilities Commission (Dec. 21, 2001) at 10. It also claimed that it had "learned of numerous methods by which a pipeline and affiliate can work in concert to benefit the common goal of their parent corporation." *Id.* But those remarks are mere restatements of the *theoretical* threat; they do not constitute record evidence of abuse by pipelines and their non-marketing affiliates. The CPUC did note one complaint, but that incident concerned a *marketing* affiliate. *See id.* at 11 (referring to a complaint filed in *Public Utilities Commission of the State of California v. El Paso Natural Gas Co.*, 91 FERC ¶ 61,312 (June 28, 2000), a case that involved El Paso Natural Gas Company, El Paso Merchant Energy-Gas, L.P., and El Paso Merchant Energy Co.).

• FERC pointed to comments from the Illinois Commerce Commission, which "applauded" FERC's approach. But the Illinois commission similarly did not provide any examples of misconduct with respect to non-marketing affiliates. It restated the potential threat of abuse by *marketing* affiliates: "Indeed, as a theoretical matter, an even greater degree of independence between the transmission function and market participant activities of the merchant function than that proposed . . . could foster more vibrant wholesale and retail competition . . . ."

Comments of the Illinois Commerce Commission (Dec. 20, 2001) at 8.

• FERC cited the submission of the National Association of State Utility Consumer Advocates (NASUCA). But that group simply explained that "[t]he relatively small number of formal complaints that have been brought before [FERC] does not necessarily indicate that there are few anti-competitive transactions between interstate transmission providers and their affiliates." Comments of the National Association of State Utility Consumer Advocates (Dec. 20, 2001) at 2. The NASUCA mentioned state proceedings involving retail rates, but it acknowledged that they did not "bear directly" on Order 2004 and alleged only that affiliate relationships "*may* have had anti-competitive impacts in the wholesale gas and electric markets." *Id.* at 1-2 (emphasis added). The NASUCA concluded that there exists "the *potential* for interstate pipelines to engage in anti-competitive behavior" with non-marketing affiliates and "[s]uch activities *may* have anti-competitive implications for the interstate market . . . ." *Id.* at 4-5 (emphases added).

• FERC referred to comments from the Federal Trade Commission's Bureau of Economics and Office of the General Counsel. But those comments offered no examples or factual evidence; they noted only that "it is *possible* that a transmission provider's market power . . . could be transferred to and exercised by its affiliated businesses . . . ." Comments of the Staff of the Federal Trade Commission (Dec. 20, 2001) at 3 (emphasis added). What is more, the report cited by the FTC Staff addressed the electric power industry – not the natural gas industry – and relied largely on FERC's assertions, not the FTC's independent examination of the industry. *See id.* at 2-3 & nn.4-5 (citing FTC Staff Report: Competition and Consumer Protection Perspectives on Electric Power Regulatory Reform,

Focus on Retail Competition (Sept. 2001) at 13, *available at* http://www.ftc.gov/reports/index.htm).

• FERC referenced the comments of the American Antitrust Institute. That organization, however, did not provide any examples of pipelines granting undue preferences to their non-marketing affiliates by divulging information about transmission systems. It simply stated that "[s]uch information sharing, if unimpeded, *could* allow the transmission company to *potentially* frustrate or preclude its existing or prospective downstream rivals' access to the network." Comments of the American Antitrust Institute (Dec. 20, 2001) at 2 (emphases added). Moreover, the Institute actually urged FERC to consider more carefully the costs of the Standards: "Given the importance of efficiencies generated by vertical integration, AAI believes it is appropriate for FERC to make at least a cursory attempt to scope out the costs and benefits of uniform imposition of standards of conduct." *Id.* at 4.

• FERC cited the comments of the Natural Gas Supply Association, an organization that represents independent gas producers and marketers. Those comments likewise did not point to any examples of abuse involving non-marketing affiliates. Comments of the Natural Gas Supply Association (Dec. 20, 2001) at 5.

4. As the dissenting Commissioners explained, FERC was wrong to conclude that the evidence supporting Order 2004 is similar to the evidence that supported Order 497. In *Tenneco*, FERC pointed to numerous complaints by competitors and many documented instances of abuse between pipelines and their marketing affiliates. *See* 969 F.2d at 1197-98; *cf. Chamber of Commerce v. SEC*, 412 F.3d 133, 140-42 (D.C. Cir. 2005) (explaining that the SEC identified significant abuses in the mutual fund industry and adopted rules to prevent them). We

relied on that record evidence in upholding FERC's Order. Here, by contrast, FERC has cited *no* complaints and provided *zero* evidence of actual abuse between pipelines and their non-marketing affiliates. FERC staked its rationale in part on a record of abuse, but that record is non-existent. Professing that an order ameliorates a real industry problem but then citing no evidence demonstrating that there is in fact an industry problem is not reasoned decisionmaking. *See State Farm*, 463 U.S. at 42-43.

Perhaps recognizing the deficiency of the record evidence, FERC's attorneys have defended the Order before this court in part by attempting to explain away the insubstantial nature of the record evidence. Of course, FERC's Order relied in part on record evidence of abuse, so explaining away the *absence* of such evidence merely underscores the need to vacate the Order and remand. In any event, even on their own terms, the explanations do not hold water. FERC's brief claims, for example, that there may have been little evidence because "the affiliate activity in question was not yet covered by [the] Standards of Conduct." Respondent's Br. at 28. But that was also true at the time of Order 497, yet FERC had received numerous complaints and amassed substantial evidence of abuse arising from the relationship between pipelines and their *marketing* affiliates. If abuse arising from the relationship between pipelines and *non-marketing* affiliates were similarly rampant, FERC likely would have been inundated with complaints and evidence, as it was before issuing Order 497. *See Tenneco*, 969 F.2d at 1194.

In a separate effort to justify the absence of evidence, FERC's brief also resorts to a claim that "the absence of specific documented instances of abuse by non-marketing Energy Affiliates does not mean they have not occurred." Respondent's Br. at 29. The Administrative Procedure Act does not tolerate

that kind of truism as the basis for the administrative action here.

### III

On remand, FERC may decide not to proceed with rules in this area. Alternatively, it may seek to develop a factual record that could fully satisfy the standard of *Tenneco*.

In the absence of factual evidence that satisfies *Tenneco*, FERC may try to support the Standards by setting out its best case for relying *solely* on a theoretical threat of abuse. In *Tenneco*, of course, FERC presented both a theoretical threat and actual evidence of abuse to justify adopting the Standards for marketing affiliates; we express no view here whether a theoretical threat *alone* would be sufficient to justify an order extending the Standards to non-marketing affiliates.

In *Tenneco*, in remanding certain provisions of Order 497, this court provided specific guidance to FERC on what it could do on remand if it chose to re-promulgate those provisions. *See Tenneco Gas v. FERC*, 969 F.2d 1187, 1199, 1201 (D.C. Cir. 1992). We provide similar guidance here. If FERC chooses to rely solely on a theoretical threat, it will need to explain how the potential danger of improper communications between pipelines and their non-marketing affiliates, unsupported by a record of abuse, justifies such costly prophylactic rules. FERC would need to explain why the individual complaint procedure under Section 5 of the Natural Gas Act does not suffice to ensure that pipelines are not abusing their relationships with non-marketing affiliates. *See* 15 U.S.C. § 717d(a); *cf.* Order 497, at 31,130 (relying in part on complaint procedure in declining to extend Standards to non-marketing affiliates). If FERC believes that the nature of the alleged misconduct renders it undetectable through normal reporting mechanisms, FERC would have to

say, for example, why such evidence of abuse was detected before it adopted Order 497. If FERC points to the number of mergers between gas and electric companies in recent years, it must address our decision in *Dominion Resources, Inc. v. FERC*, 286 F.3d 586 (D.C. Cir. 2002), where we stated that "the logic of correcting anticompetitive hazards posed by a merger implicitly suggests remedies only *between* the merging companies," not *within* pre-existing entities. *Id.* at 593. If FERC cites the rise of a variety of new services, mostly relating to the commodity market, it will need to elucidate how those developments relate to and justify the promulgation of costly prophylactic rules governing pipelines' relationships with their non-marketing affiliates. If FERC relies on an increase in the amount of pipeline capacity held by non-marketing affiliates, it must explain how that poses a threat of actual abuse by pipelines and their non-marketing affiliates (and why the rule should also apply to affiliates that do not ship on their affiliated pipelines). If FERC chooses to extend the Standards to entities that do not hold or control capacity, the Commission would need to justify such an extension given that a stronger theoretical threat exists with respect to affiliates that hold or control capacity on affiliated pipelines than to affiliates that do not hold or control such capacity. *See* Comments of the Staff of the Federal Trade Commission (Dec. 20, 2001) at 4 n.8. We cannot say that any of these theoretical rationales, alone or in combination, would justify adoption of the Standards of Conduct under the *Tenneco* standard; they merely illustrate the kind of analysis FERC would need to undertake if it attempts to support the Order based solely on a theoretical threat (that is, absent record evidence of abuse).

## IV

We grant the pipelines' petition, vacate Orders 2004, 2004-A, 2004-B, 2004-C, and 2004-D as applied to natural gas

pipelines, and remand to the Federal Energy Regulatory Commission.

*So ordered.*